IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TABATHA C. MANLEY, | : | Case No. 1:06-CV-634 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING DEFENDANT'S |
| | : | MOTION FOR SUMMARY |
| PARAMOUNT'S KINGS ISLAND, et al., | : | JUDGMENT |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

This matter is before the Court on Defendant Cedar Fair LP, d/b/a Paramount's Kings Island's Motion for Summary Judgment. (Doc. 12.) Plaintiff Tabatha Maney filed this suit against Defendant Paramount's Kings Island (hereinafter "PKI") and various John Does and Jane Does, asserting federal claims under 42 U.S.C. §§ 1983 and 1988 for violations of her Fourth, Eighth, and Fourteenth Amendment rights, along with state claims for false arrest, assault and battery, and malicious prosecution. (Doc. 1.) Defendant PKI moves for summary judgment on all of Plaintiff's claims. (Doc. 12.) Plaintiff opposes Defendant's motion (Doc. 18.) For the reasons that follow, the Court **GRANTS** Defendant's Motion for Summary Judgment.

I.      BACKGROUND

The instant case stems from an incident that took place on October 16, 2004 at the PKI theme park, wherein several PKI security officers[1] confronted the Plaintiff, Tabatha Manley,

---

[1] The parties refer to the security officers involved in this case, Officers Dorian LaCourse, Kenny Voskuhl, David Broughton, and Kelly Dorsey, as both security guards and park police officers. It is unclear whether PKI currently employs multiple levels of security officers. Defendant provides evidence that, as a PKI Police Officer, LaCourse has "authority on park property, including the parking lot, to detain, arrest, [and] eject individuals from the park

after another park attendee, Leighann Goins, accused Manley of stealing her purse. On that day, Goins visited PKI with several of her friends. (Flick Aff. ¶ 1.) At approximately 10:00 p.m., Goins and one of her friends, Erin Flick, were getting ready to be seated on a roller coaster ride known as the Beast. (Id., Ex. 1.) Just prior to getting into their seats, the girls stored their purses in a cubby next to the ride, with Goins' purse sitting on top of Flick's. (Id. ¶ 2, Ex. 1.) Plaintiff Manley, who was also at PKI that night with her husband and several other relatives, also rode the beast at that time. (Tabatha Manley Dep. 17:19-24.) Like Goins and Flick, Manley and her relatives stored their possessions, a basketball and possibly some stuffed animals, in a cubby prior to getting on the ride. (Id. at 18:10-19.)

After leaving the Beast, Manley removed her basketball from the cubby and headed to a restroom near the ride with her son and one of her sisters. (Id. at 18:20-19:5.) Meanwhile, Goins also exited the ride and found that her purse was missing from the cubby. (Flick Aff. ¶ 3.) Flick, who had previously experienced a similar incident when another friend's purse was stolen, suggested that she and Goins check the nearest restroom to see if someone had taken the purse in there. (Id. ¶ 4, Ex. 1.)

Once in the bathroom, a third friend who had accompanied Goins and Flick called Goins' cell phone, which had been in the purse, to see if they could hear it ringing. (Id. ¶ 5.) According to Flick, the plan worked and they heard Goins' phone, which Flick described as having a "distinctive ringtone." (Id.) While Goins and Flick walked up and down in front of the stalls trying to determine which stall the ringing was coming from, they noticed two young children in

---

and file criminal complaints when crimes were committed." (LaCourse Aff. ¶ 1.) However, neither Plaintiff nor Defendant adequately describes the scope of authority granted to Officers Voskuhl, Broughton, or Dorsey.

the bathroom looking nervously at each other.  (Id., Ex. 1.)  After determining that the ringing was coming from the first stall, Goins and Flick waited in front of that door.  (Id.)  Eventually, Manley emerged from the stall.  Flick described Manley as "short stocky, a little overweight, with curly brown hair that came close to her shoulders or below," and claimed she was "wearing a dark blue or dark grey fleece jacket with a large red stripe across the chest."  (Id. ¶ 6, Ex. 1.)  According to Flick, the phone was no longer ringing by the time Manley exited the stall, but Flick noticed that there was a square bulge in her sweatshirt.  (Id. ¶ 7.)

During her deposition, Manley testified that it was loud in the bathroom and that she could not remember whether or not she had heard a phone ringing.  (Tabatha Manley Dep. 19:6-13.)  When Manley left the bathroom, she headed out of the park with her family.  (See id. at 19-20; Flick Aff. ¶ 8, Ex. 1.)  Goins and Flick followed her.  They passed a PKI security officer and asked for help, but the officer said he was unable to do anything.  Goins then thought that she saw Manley and a smaller figure go behind a kiosk, but she could not tell what they were doing.  When the two figures emerged from behind the kiosk, Goins and Flick checked the area and found Goins' emptied purse.  (Flick Aff. ¶ 10.)  Manley denies ever going behind a kiosk to drop off Goins' purse.  (Tabatha Manley Dep. 21-22.)  After finding the purse, Goins and Flick approached Manley and her family and asked them to return Goins' possessions.  (Flick Aff. ¶ 11, Ex. 1; Tabatha Manley Dep. 20:17-21:12.)  Manley denied taking the purse and offered to let the girls use her cell phone to try to call Goins' cell phone.  (Id.)  This time, the girls did not hear Goins' cell phone ring.  Subsequently, Manley continued walking toward the exit of the park.  (Id.)

According to Defendant PKI, while Manley and her family attempted to leave, Flick found another PKI security officer, Kenny Voskuhl, and told him about the suspected theft. (Flick Aff. ¶ 12.) In his written statement, Voskuhl describes his initial encounter with the girls as follows:

> I was alerted by two juvenile guests that their purse containing a cell phone and a digital camera had been stolen from "The Beast." One subject stated that she saw a woman wearing a light blue jacket, with two kids with red glowing decorations for their hair. I noticed the family visually and flashed my flashlight on the three people, at which point, they began running through the parking lot.

(LaCourse Aff. Ex. 1.) Voskuhl pursued Manley and her family and alerted his supervisor, PKI Police Officer Dorian LaCourse, for assistance. (Id., Ex. B.) Voskuhl, still accompanied by Goins and Flick, then stopped Manley and questioned her briefly. (Id., Ex. B.) Meanwhile, two other PKI security officers, David Broughton and Kelly Dorsey, arrived on the scene. (See id., Ex. 1.) Shortly thereafter, Officer LaCourse responded to the parking lot. Broughton advised LaCourse that Goins purse had been stolen from the Beast and that she had identified Manley in the bathroom when she called her cell phone and heard it ringing in Manley's stall. (Id. ¶ 2.) Defendant maintains that Officer LaCourse spoke to Manley, but did not detain her, place her under arrest, search her person or car, or make any physical contact with her. (Id.) Nor did any of the other officers make any physical contact with Manley. (Id.) Instead, LaCourse simply questioned Manley for a few minutes until she asked to leave, at which time LaCourse did not prevent her from doing so because he felt there was insufficient evidence to detain her. (Id. ¶ 4.)

Manley provides a somewhat different account of the events that transpired in the parking lot. She claims that once she was in the parking lot, Goins and Flick approached her with an officer. (Tabatha Manley Dep. 22:17-23.) The security officer, later identified as

4

Officer Voskuhl, told Manley to wait, but let her and her family get into their car and sit down. (Id. at 24:20-25:5.) Manley admits that she never stated that she wanted to leave. (Id. at 25:6-8.) According to Manley, Officer Voskuhl asked her if she had Goins' belongings and told her that the girls had heard a phone ringing near her. (Tabatha Manley Dep. at 25:17-18.) Manley responded that the girls had confronted her and that when they tried to call Goins' phone at that point, they did not hear it ringing. (Id. at 25:19-21.) Shortly thereafter, several other officers arrived in the scene in what Manley described as a "regular cop car." (Id. at 25:24-26:10.) Manley claims that these officers questioned her and tried to call Goins' phone once again, but did not hear any ringing. (Id. at 26:13-26:18.) At some point during the questioning Manley got out of her car and continued talking to the officers while standing outside. (Id. at 26:5-8.) Though she claimed that one of the officers acted like he was going to grab her, she could not remember if anyone actually did grab her and stated that when one officer looked like he was going to "come at" her, another officer "stepped in and made him leave." (Id. at 49:19-50:11.) She further testified that none of the officers searched her or the car. (Id. at 50:12-24.) Nor did they, at any point, handcuff her or hold her against her will. (Id. at 25:3-27:1.)

Manley's husband also provided deposition testimony about the account. His testimony further complicates the facts as it contradicts not only the officers' statements, but also Plaintiff Manley's testimony. For example, though there is no record of any police officers from the City of Mason arriving on the scene, Manley's husband claims that they did. (Troy Manley Dep. 20.) Contrary to Plaintiff Manley's testimony that the officers did not search her or the car (Tabatha Manley Dep. 50:14-24), Manley's husband testified that before the officers let them get into the

5

car the Mason police officers[2] looked in the vehicle, which was already open, with a flashlight, and checked the belongings that the Manleys were holding. (Troy Manley Dep. 20:14-22.) Specifically he stated that the officer "didn't pat all of us down, but he like checked our belongings we was holding." (Id. at 20:21-22.) As to the car, he testified as follows:

> Q. So after the Mason police looked at your belongings – what did they do to look at your belongings? Did they open up your bags?
>
> A. None of us had any bags. He took a flashlight and looked all around my car. There was like coats and stuff on the seats , and he kind of moved the coats around a little bit. He didn't physically pick up and root through it. He just looked around. And we was all standing there holding our pockets out, kind of volunteering to him, showing we didn't have anything.

(Id. at 24:21-25:10.) Next, Manley's husband testified that at one point one or more of the officers held Manley's arm and detained her up against the car. (Id. at 21:24-22:18.) Again, this testimony contradict's Manley's own testimony that the officers did not hold her against her will.

After Manley and her family left the park, LaCourse reviewed the surveillance tape that captured the area at the Beast where patrons placed their belongings during the ride. (LaCourse Aff. ¶ 5.) The video showed Goins placing her purse in a cubby. It then showed Manley placing a basketball in the same bin. Later, the video shows Manley, after she had exited the ride, reach for the basketball and stand by the cubby for a few minutes. At that time, she spoke with two other individuals. The video then revealed one of those individuals grabbing the purse and leaving the area with Manley. (Id.) LaCourse then drafted his own official statement of the incident and collected statements from the other officers who were present. (Id. ¶ 6, Exs. 1-2.) The following day, on October 17, 2004, Goins sent LaCourse an email describing the contents

---

[2] As to any "search" that is alleged to have occurred, Troy Manley testified that it was Mason police officers rather than PKI officers who checked their belongings and looked in the car. (Troy Manley Dep. 21:7-13.)

of her purse and what she had observed, and on October 18, 2004, LaCourse received a similar statement from Flick, describing in detail the events that she and Goins observed on October 16. (Id. ¶¶ 7-8, Exs. 3-4.) Defendant maintains that based on these statements and the video surveillance tape, LaCourse determined that probable cause existed to support filing a criminal complaint. (Id. ¶ 9.) Accordingly, LaCourse corresponded over email with Robert Peeler, the City of Mason Prosecutor. (See Id. ¶ 9, Ex. 5.) According to Defendant, Peeler advised LaCourse to charge Manley with theft as opposed to complicity to commit theft. (Id.) After receiving this advice, LaCourse filed the complaint. (Id.)

On October 2, 2005, Warren County Police Officers arrested Manley on charges stemming from the PKI incident. The officers arrested Manley pursuant to a valid warrant at River City, a rehabilitation center where Manley was staying pursuant to the terms of her probation in an unrelated case in Butler County. The officers transported Manley to Warren County, where she was processed and held for two and a half days. At her arraignment hearing, which took place on October 4, 2005, the court granted her release on her own recognizance. However, because the criminal charge in Warren County created an automatic probation violation as to the Butler County criminal matter, rather than actually being released, Manley was transported back to Butler County and spent another eight days in jail. On October 4, 2005, the Mason, Ohio Municipal Court held a preliminary hearing, at which time the court dismissed all charges against Manley. The court's entry of judgment states in relevant part, "Based on the evidence and testimony presented the court did not find that the crime described in the complaint had been committed nor did the court find that the above named defendant committed it." (Doc. 18, Ex. 1.) Subsequently, Manley filed the instant lawsuit.

7

## II. JURISDICTION AND SUMMARY JUDGMENT STANDARD

The Court has jurisdiction over Plaintiff's § 1983 claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." Id. at 252.

In reviewing the evidence set forth by both the moving and non-moving parties, the Court must carefully review "those portions of the submitted evidence *designated* by" both parties.

Guarino v. Brookfield Twp. Tr's., 980 F.2d 399, 410 (6th Cir. 1992) (emphasis added). However, the Court will not "sua sponte comb the record from the partisan perspective of an advocate for the non-moving [or moving] party." Id.

### III. ANALYSIS

#### A. 42 U.S.C. § 1983

Section 1983 is not itself a source of substantive rights but provides "a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989). Thus, to establish a claim under § 1983, a plaintiff must "identify a right secured by the United States Constitution and deprivation of that right by a person acting under color of state law." Russo v. City of Cincinnati, 953 F.2d 1036, 1042 (6th Cir. 1992). As the basis of her § 1983 claims, Manley asserts violations of her Fourth, Eighth, and Fourteenth Amendment rights. Defendant PKI argues that it is entitled to summary judgment as to these claims because Manley fails to show that PKI acted under color of state law and cannot prove a deprivation of her constitutional rights.

##### 1. Color of State Law

In this action, Plaintiff does not name any local government or governmental agency as a defendant. Instead, she sues only PKI, a privately owned amusement park, alleging that PKI police officers violated her rights. A private individual or entity acting on its own cannot deprive a citizen of his constitutional rights. Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982); see also Lansing v. City of Memphis, 202 F.3d 821, 828 (6th Cir. 2000). However, under § 1983, a private party's actions may constitute state action when those actions are "fairly attributable to the state." Lugar, 457 U.S. at 947. The Supreme Court has developed three tests

for determining whether private action is fairly attributable to the state: (1) the symbiotic relationship or nexus test; (2) the public function test; and (3) the state compulsion test. Chapman v. Higbee Co., 319 F.3d 825, 833 (6th Cir. 2003); see also Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

"The inquiry is fact-specific, and the presence of state action is determined on a case-by-case basis." Chapman, 319 F.3d at 834 (citing Burton v. Wilmington Parking Auth., 365 U.S. 715 (1961)). Though "it is possible to determine . . . whether a person acted under color of state law as a matter of law, there may remain in some instances unanswered questions of fact regarding the proper characterization of the actions for the jury to decide." Layne v. Sampley, 627 F.2d 12, 13 (6th Cir. 1980).

Plaintiff first argues that the public function test is met because PKI's actions in seizing Manley and then filing a criminal complaint in order to have her arrested are public functions. Under the public function test, a private party can become a state actor by exercising powers traditionally reserved exclusively to the state. Chapman, 319 F.3d at 833. The Sixth Circuit has previously noted that "the mere fact that the performance of private security functions may entail the investigation of a crime does not transform the actions of a private security officer into state action." Id. at 834. Indeed, courts have interpreted the public function test narrowly, finding that only functions such as holding elections, exercising eminent domain, and operating a company-owned town fall within this category of state action. Id. at 833. Nonetheless, "[t]he Supreme Court has expressly left open the question whether and under what circumstances private police officers may be said to perform a public function for purposes of § 1983." Romanski v. Detroit Entertainment, L.L.C., 428 F.3d 629, 636 (6th Cir. 2005).

In the instant case, private security guards are alleged to have detained individuals suspected of stealing from another private individual rather than from PKI. In determining whether this particular situation fits within the parameters of the public function test, the Court finds guidance in prior decisions of the Sixth Circuit. For example, the Sixth Circuit has held that a private security officer employed by a department store does not perform a public function by detaining and searching a suspected shoplifter because such action is taken in the interest of self-protection. Chapman, 319 F.3d at 833. In other words, the guard is acting in furtherance of the private employer's interest in protecting the store's property.

In another case, the Sixth Circuit held that:

> Where private security guards are endowed by law with plenary police powers such that they are de facto police officers, they may qualify as state actors under the public function test. The rationale of these cases is that when the state delegates a power traditionally reserved to it alone-the police power-to private actors in order that they may provide police services to institutions that need it, a plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected.

Romanski, 428 F.3d at 637 (internal citations and quotations omitted). In Romanski, the plaintiff sued MotorCity Casino and several private security guards in the employ of the casino after they detained and questioned her when she picked up a chip from the ground and used it to play a slot machine in violation of casino policy. The security officers in question had been licensed as private security police officers under Michigan law, meaning that the Michigan Department of State Police had reviewed their qualifications and that they remained subject to certain statutes administered by that department. Id. Further, as licensed private security police officers, they had broad powers to make arrests within the entirety of the casino's premises at their discretion and for any number of offenses. Id.

The Romanski court distinguished that case from cases wherein security officers are not exercising powers exclusively reserved for the state, such as broad arrest powers, but rather are exercising common law privileges such as the right to detain for trespass, the shopkeeper's privilege, and the right to carry a weapon. Id. at 638. The court noted that while those activities may appear analogous to the public functions of state police officers, they are not traditionally reserved to the state and may be invoked by private citizens under appropriate circumstances. Id.

Under Ohio law, peace officers can include proprietary private police or security officers. See Ohio Rev. Code §§ 109.71(A)(20)[3] and 4973.17. Once an amusement park has applied for and has been granted the appointment of a private police officer, the scope of that officer's authority is determined by written agreement between the owner or operator of the amusement park and "the appropriate chief or chiefs of police of the political subdivision or subdivisions in which the amusement park is located." Ohio Rev. Code § 4973.17(E)(1)(b).

It is unclear whether Officer LaCourse or any of the other security officers who interacted with Manley are appointed to PKI pursuant to Ohio Rev. Code § 4973.17. LaCourse stated that he has the "authority on park property, including the parking lot, to detain, arrest, [and] eject individuals from the park and file criminal complaints when crimes were committed." (LaCourse Aff. ¶ 1.) He does not indicate that his power to arrest or detain individuals is limited to certain offenses, but rather describes a broad power that may be exercised throughout PKI

---

[3] Ohio Rev. Code § 109.71(A)(20) defines a peace officer to include "A police officer who is employed by an owner or operator of an amusement park that has an average yearly attendance in excess of six hundred thousand guests and that employs and maintains its own proprietary police department or security department, and who is appointed and commissioned by a judge of the appropriate municipal court or county court pursuant to section 4973.17 of the Revised Code."

12

property. Such power is closely analogous to the power granted the security officers in Romanski. Further, the officers in this case were not exercising any identifiable common law privilege. They did not stop Manley due to an alleged theft of PKI property or any illegal trespass on PKI property. Instead, Defendant PKI's officers intervened to assist a private citizen who claimed Manley had stolen her property.

Taking into consideration the particular circumstances of this case, the Court finds that questions of fact remain as to whether the PKI officers were operating as state actors on the night in question. While it is unclear, as stated above, whether all of the officers have the same level of authority and responsibility as Officer LaCourse, that there remains a question of fact as to the precise authority granted to each officer does not alter the Court's analysis. Instead, it simply indicates that the Court cannot rule as a matter of law on whether the state action requirement is met.

As the Court has determined that questions of fact remain as to whether the PKI officers can be considered state actors under the public function test, the Court need not analyze the officers' actions under the remaining tests. Such analysis would be particularly unnecessary given that the Court finds, as discussed below, that Manley's federal claims cannot survive summary judgment as she fails to show any violation of her constitutional rights.

### 2. Deprivation of Constitutional Rights

Manley asserts a deprivation of her Fourth, Eighth, and Fourteenth Amendment rights; however, the only right Plaintiff addresses in her response to Defendant's motion for summary judgment is her Fourth Amendment right to be free from unreasonable seizure and arrest absent probable cause. Manley entirely omits any discussion of any alleged Eighth or Fourteenth

Amendment rights. Further, the Court finds no facts suggesting a deprivation of either right. Rights under the Eighth Amendment, which proscribes the infliction of "cruel and unusual punishments," do not arise until after an individual has been convicted, which never occurred in this case. U.S. Const. amend. VIII; see also Cabaniss ex rel. Estate of Cabaniss v. City of Riverside, 497 F. Supp. 2d 862, 886 n.26 (S.D. Ohio 2006).

As to her Fourteenth Amendment claim, Manley fails to allege any deprivation independent of that alleged in connection with her Fourth Amendment rights. Without such guidance, attempting to discern the precise nature of Manley's Fourteenth Amendment claim is akin to shooting in the dark. To the extent Manley meant to allege a violation of her substantive due process rights, the Supreme Court has previously made clear that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)); see also Montgomery v. Carter Cy., 226 F.3d 758, 769 (6th Cir. 2000). In this case, Plaintiff's claims fall squarely within the Fourth Amendment. Accordingly, as an initial matter, Manley's § 1983 claims necessarily fail to the extent that they are based on an alleged deprivation of rights secured under either the Eighth or Fourteenth Amendment.

Left to discern whether PKI's actions violated Manley's Fourth Amendment rights, the Court turns first to Manley's assertion that her detention on October 16, 2007 was unreasonable. As to this claim, the Court notes that under the Fourth Amendment, probable cause is not always required in order to detain a suspect. To the contrary, an officer may "stop and briefly detain a

14

person for investigatory purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio," 329 U.S. 1, 30 (1968)). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or 'hunch.'" Id. at 7 (quoting Terry, 392 U.S. at 27). The Court considers the totality of the surrounding circumstances in determining whether the officer has a particularized and objective basis for suspecting criminal activity. United States v. Arvizu, 534 U.S. 266, 274 (2002).

The PKI security officers in the instant case had reasonable suspicion to detain Manley to investigate the theft of Goins' purse. At the time that Officer Voskuhl first stopped Manley, he was aware of the following facts: First, Goins and Flick had relayed to him the fact that Goins' purse had been stolen, explained the incident to him, and described Manley and her family. (See Flick Aff. ¶¶ 12-13, Ex. 1; LaCourse Aff. Ex. 2.) Additionally, when Voskuhl located Manley and her family in the parking lot and shined his flashlight on them, they started running away from him.[4] (LaCourse Aff. Ex. 2.) Finally, Goins and Flick remained with Voskuhl while he confronted Manley and as a result were present to identify her as the woman they had been following. When the other three PKI officers, including Officer LaCourse, arrived on the scene, they were advised that Goins' purse had been stolen from the Beast and that she had identified the suspect as Manley. (Id. ¶ 2, Exs. 1, 2.) Under these circumstances the officers had reasonable suspicion to briefly detain Manley in order to question her about the stolen goods.

Manley next suggests that even if the initial stop was reasonable, the officers exceeded

---

[4] The Supreme Court has "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Illinois v. Wardlow, 528 U.S. 119, 124 (2000).

the scope of the permissible stop by detaining and questioning her for over an hour, and by searching the vehicle. An investigatory stop that was initially permissible may nonetheless become unlawful if the officers' continued detention of the suspect exceeds the scope of the stop permitted by the Fourth Amendment. The Supreme Court has declined to adopt a per se rule for the acceptable length of an investigative stop. See United States v. Sharpe, 470 U.S. 675, 686 (1985). Instead the Supreme Court holds that the length of the stop must be reasonable under the circumstances, stating that "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop," courts are to consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect]." Id.

The only evidence Manley cites in support of her assertion that the stop lasted over an hour is the fact that it is undisputed that Manley was initially stopped at approximately 10:30 p.m and Officer Voskuhl did not sign his incident report until approximately 12:00 a.m. (LaCourse Aff. Ex. 2.) The fact that Officer Voskuhl may not have completed his written report until midnight, an hour and a half after first stopping Manley, does not indicate that the stop itself lasted over an hour. Nor does it contradict other evidence showing that the detention lasted no more than fifteen minutes to a half an hour. For example, Officer Voskuhl reported that he first approached Manley shortly after talking to Goins and Flick at approximately 10:30 p.m. and that he was released from the situation at approximately 10:45 p.m. (Id.) Additionally, LaCourse stated that he spoke to Manley for only a few minutes before permitting her to leave. (Id. ¶ 4.) Even when viewed in a light most favorable to Plaintiff, the evidence shows only that the officers detained Manley for no more time than was necessary to ask her a few questions

16

about the alleged theft before determining that they lacked sufficient evidence to hold her. Under the circumstances, the detention was not excessive.

As to the alleged search of the Manley's vehicle, Plaintiff Manley testified that the officers did not in fact search the vehicle. (Tabatha Manley Dep. 50:12-24.) To the extent that Manley's husband claimed that one of the officers looked at the items in the car with a flashlight, he also maintained that the officer was a City of Mason police officer who arrived after the PKI officers, and there is no allegation that any PKI officer attempted to search Manley's car. (See Troy Manley Dep. 20, 24, 25.)

Manley next alleges that PKI caused her unlawful arrest. The fact that no PKI officer directly participated in Manley's actual arrest is not dispositive of Plaintiff's claim. Liability for an unlawful arrest can extend beyond the officer who actually effected the arrest to other government officials whose actions set the arrest in motion. See Malley v. Briggs, 475 U.S. 335, 344 n. 7 (1986) (holding that a police officer may be liable under § 1983 for obtaining an arrest warrant without probable cause even though another officer made the actual arrest); Gordon v. Degelmann, 29 F.3d 295, 298 (7th Cir. 1994) (citing Kilbourn v. Thompson, 103 U.S. 168, 200 (1880)) ("One who directs or assists an unlawful arrest may be liable."); Berg v. County of Allegheny, 219 F.3d 261, 272 (3rd Cir. 2000) ("As a general rule, a government official's liability for causing an arrest is the same as for carrying it out."). In this case, Manley contends that Officer LaCourse, acting under color of state law, filed a criminal complaint against her absent probable cause to believe she had committed the alleged crime.

The Supreme Court has defined "probable cause" as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable

17

caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. at 37, 99 S.Ct. at 2632. Citing the fact that the municipal court judge presiding over her criminal case dismissed the theft charge after finding a lack of evidence to demonstrate that she had committed the alleged crime, Manley argues that there necessarily exists a question of fact as to whether or not LaCourse had probable cause to file the complaint. However, the Sixth Circuit has previously indicated that "[a]n arrest grounded in probable cause does not become invalid merely because the State chooses not to prosecute the individual or a jury opts for acquittal." Williams ex rel. Allen v. Cambridge Bd. of Educ., 370 F.3d 630, 638 (6th Cir. 2004).

Indeed, the Court finds that despite the state court's ruling, there was probable cause to believe Manley had stolen or at least participated in the theft of Goins' purse. As indicated above, LaCourse did not file the complaint until after: (1) collecting statements from both Goins and Flick as well as the other responding officers, and (2) watching the PKI surveillance video which showed Manly standing by the cubbies while one of her companions, a young girl, reached in to grab Goins' purse. The video sufficiently corroborated Goins' and Flick's allegations that they later heard Goins' phone ringing in the bathroom stall that Manley occupied and that they believed they saw Manley go behind a kiosk where they only moments later discovered Goins' emptied purse. Finally, before filing the complaint, LaCourse consulted the City of Mason prosecutor about what charge to allege. Considering these undisputed facts, the Court finds that the facts and circumstances within Officer LaCourse's knowledge at the time he

filed the complaint were sufficient to warrant a reasonable belief that Manley had stolen Goins' purse. Accordingly, Plaintiff's § 1983 unlawful arrest claim fails as a matter of law.[5]

### B. State Law Claims

As the Court has dismissed all of Plaintiff's federal claims, it declines to exercise jurisdiction over and dismisses without prejudice Manley's remaining state law claims. See 28 U.S.C. § 1367(c)(3).

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment as to all of Plaintiff's 42 U.S.C. § 1983 claims and **DISMISSES WITHOUT PREJUDICE** all of Plaintiff's state law claims.

IT IS SO ORDERED.

   s/Susan J. Dlott          
Susan J. Dlott
United States District Judge

---

[5] To the extent Manley sought to also allege a federal malicious prosecution claim under the Fourth Amendment, this claim also fails. See McKinley v. City of Mansfield, 404 F.3d 418, 444-45 (6th Cir. 2005) ("[I]t nonetheless remains firmly established that where there is probable cause to prosecute, a § 1983 action for malicious prosecution will not lie.").